IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| ANTONIO DIAZ | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 5:16-CV-00317 |
| VS. | § | |
| | § | |
| LANDSTAR INWAY, INC., *et al.* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERT WITNESS WARREN NEELY**

TO THE HONORABLE JUDGE:

NOW COMES, Antonio Diaz, Plaintiff, and files this Motion to Exclude Testimony of Dr. Warren Neely, Defendants' Retained Expert, and respectfully shows unto the Court the following:

**INTRODUCTION**

Plaintiff, Antonio Diaz was operating a commercial vehicle on January 20, 2015. On the date in question, Mr. Diaz was sitting at a complete stop waiting in line at a border patrol checkpoint on the Northbound lane of Interstate 35 in Webb County, Texas. While waiting in line at the checkpoint, Mr. Diaz's vehicle was struck from behind by a Landstar Inway, Inc., Defendant, commercial vehicle, operated by Defendant Octavio Dobos.

Defendant's produced Dr. Neely's Rule 26 report on August 25, 2017.[1] Defendants also produced a Supplemental Expert Report on February 6, 2018.[2]

---

[1] See Exhibit A is Dr. Neely's Rule 26 report.
[2] See Exhibit B Is Dr. Neely's Supplemental Report

On November 11, 2017 Defendants designated Mr. Neely as an expert in neurosurgery who would be testifying to:

> Dr. Neely is an neurosurgeon who is familiar with the standard of care for the physicians, chiropractors, physical therapists, nurses, physician assistants, and other health care personnel who treated Plaintiff. The subject matter of Dr. Neely's testimony includes analyzing the medical treatment received by Plaintiff, the alleged future medical care, and the cause of the alleged injuries, if any. Dr. Neely will also question the reasonableness of Plaintiff's medical expenses, the necessity of Plaintiffs' medical treatment and whether or not the subject accident caused Plaintiffs' alleged physical injuries and medical condition. The general substance of Dr. Neely's mental impressions is based on his review of Plaintiff's medical records, diagnostic films, the accident report and the other documents listed in this report. Dr. Neely may offer opinions relative to standards of care, significance of clinical and operative findings, interpretation of radiographic and laboratory studies and the proximate cause of any injuries and damages being alleged by the Plaintiff in this case. Dr. Neely may challenge physicians' recommendations for surgery of Plaintiff's lumbar spine. Dr. Neely has expressed the details of his opinions in his initial written report which was produced when Defendant initially designated experts. Dr. Neely's second report, and the documents and tangible things reviewed by Dr. Neely are being timely produced to Plaintiff's counsel.[3]

Dr. Neely is not designated to give opinions in any other areas in this litigation. Dr. Neely's Rule 26 report was attached to Defendants' Expert designations[4]. In Dr. Neely's report he offers opinions which fail to satisfy FRE 702. Additionally, on November 28, 2017, Plaintiff took the deposition of Dr. Neely. During his deposition, Dr. Neely testified to a wide range of topics which (1) Were not disclosed in Defendants' Expert Designations, (2) Detailed in Dr. Neely's reports, and (3) Are not within Dr. Neely's field of expertise.

Plaintiff agrees that Dr. Neely is qualified to offer opinions in areas of neurosurgical care, therefore Plaintiff does not seek a wholesale exclusion of Dr. Neely's testimony. Rather, this Motion seeks to exclude Dr. Neely's improper opinions regarding the specific

---

[3] Attached as Exhibit C is Defendants Expert Designation; Document #22

[4] Id.

reasonable medical billing opinions disclosed in his report and during his deposition testimony.

Specifically, Dr. Neely openly admits in his deposition testimony that all medical billing amounts he addresses are based solely on either insurance discounts and/or Medicaid reimbursements recovered by his clinic.[5] Dr. Neely also admits he did not consider the cash value of the medical billing amount when coming to his opinions in this case.[6]

The specific, contested, opinions provided by Dr. Neely are conclusory, and fail to satisfy the evidentiary reliability standards experts are required to adhere to. These contested opinions, which exclusively concern the Mr. Diaz's medical treatment, do not stem from proper methodology, sufficient facts and data, are unreliable, and will not assist the trier of fact.[7]

Furthermore, during Dr. Neely's deposition testimony he offered a lengthy list of newly, never disclosed opinions, not contained in his report, as required under FRCP Rule 26. Specifically, Dr. Neely offered the following new opinions, which are not contained in his Rule 26 Report or Defendant's expert designations:

> (1) Dr. Neely's knowledge of disability findings and how they relate to Plaintiff,
> (2) Plaintiff's ability to deal with the daily stresses of life,
> (3) Plaintiffs ability to operate a commercial motor vehicle,
> (4) Plaintiff's ability to stay on task during daily activities,
> (5) Plaintiff's ability to interact with society,
> (6) Plaintiff's ability to work with others,
> (7) Plaintiff's difficulty maintaining social functions,
> (8) Plaintiffs ability to concentrate,
> (9) Dr. Neely diagnosed, for the first time ever, Plaintiff with carpal tunnel syndrome,
> (10) Plaintiff's ability to sit in an office chair for an 8-hour work day,
> (11) Plaintiff's vocational testing results, including Plaintiff's intelligence level,
> (12) His opinions on Plaintiff's vocational testing,

---

[5] See Exhibit D Neely Deposition Testimony 89:12-15
[6] See Exhibit E Neely Deposition Testimony 83:01-84:14
[7] Fed. R. Evid. 702 and *Daubert v. Merill Dow Pharm., Inc.* 509 U.S. 579, 597 (1993).

(13) Plaintiffs ability to hold more than 10 lbs,

(14) Plaintiffs necessity to lie down during a given work day,

(15) Plaintiff's ability to function in a competitive work environment,

Moreover in his deposition testimony, Dr. Neely testified that (1) He did not review any medical records where Plaintiff complained of injuries to his hand until February 25, 2015,[8] (2) He did review the Emergency Room records complaining of a hand injuries, but did not record those records or consider them because he didn't "think that [the emergency room records indicating Plaintiff immediately was complaining of hand injuries] was significant enough to really talk about,[9]" and (3) Dr. Neely never reviewed Plaintiff's EMS records[10], wherein Plaintiff immediately complained of hand injuries.

Because Dr. Neely's opinions are unreliable, unsupported, and conclusory, his testimony must be excluded.

## LEGAL STANDARD

For each of Dr. Neely's indecorous opinions, the Court must find his testimony fails to assist the fact finder in understanding the evidence. The opinions at issue fail to employ sound methodology, and the data he relied on in forming his opinions is reliable.  By Dr. Neely's own admission, his opinions concerning medical care costs, commercial vehicle operation, and mental health are unreliable.

Federal Rule of Evidence 702 allows expert opinion if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." The Rule requires that:

(1)     the testimony is based upon sufficient facts or data;

---

[8] See Exhibit F Neely Deposition Testimony 49:07-21.
[9] See Exhibit G Neely Deposition Testimony 190:10.
[10] See Exhibit H Neely Deposition Testimony 211:05-19.

4

(2)     the testimony is the product of reliable principles and methods;

(3)     the witness has applied the principles and methods reliably to the facts of the case. [11]

In *Daubert*, the Supreme Court set out the criteria that district courts are to follow in assessing challenged expert testimony offered under Federal Rules of Evidence 702. They are:

(1)     whether the theory or technique has been tested;

(2)     whether the theory or technique has been subjected to peer review and publication;

(3)     the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation;

(4)     whether the theory or method has been generally accepted by the scientific community.[12]

The party sponsoring the expert testimony has the burden of showing that the expert's findings and conclusions are based upon the scientific method and thus reliable. "This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient."[13] When questioned regarding where Dr. Neely was getting his numbers, he responded by stating "I see those numbers come in all the time…"[14]

## ARGUMENT

---

[11] FRE 702

[12] *Daubert*, 509 U.S. at 593–94.

[13] *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998)(en banc).

[14] See Exhibit I Neely Deposition Testimony 83:21-22

**I.    Dr. Neely Violates FRE 702 As It Fails To Rely Upon *Sufficient Facts and Data* When Coming To His Expert Opinions Regarding Medical Care Costs.**

During his deposition, Dr. Neely testified that in coming to the opinions contained in his report, he failed to consider the cash value of Plaintiff's future medical treatment.

```
Q.    Would you agree with me that this – this
      range that you gave on page 12 doesn't take
      into account a cash payment?
```
**A.    I would agree with that, yes.[15]**

There is no rational reason as to why Dr. Neely intentionally fails to consider the cash value of Plaintiff's medical treatment. More importantly, it is improper for Dr. Neely to not consider the very manner by which Plaintiff will satisfy his outstanding medical bills.

Acknowledging the consideration of an insurance adjusted amount of medical billing in this case, Dr. Neely's testimony exposes his improper motives underlying his bias opinions. Specifically, Dr. Neely is critical only of medical care which is not subject to Medicare or private insurance reimbursement.[16] Plaintiff is currently responsible for over one hundred thousand dollars in past medical care. Understanding Plaintiff's obligations to resolve medical debt, Dr. Neely intentionally failed to consider the cash value of Plaintiff's medical treatment. Cash value is the exact manner by which Plaintiff's bills must be repaid. Medicare, Medicaid and medical insurance are not viable options to satisfy Plaintiff's medical care costs.

It is for these reasons that Dr. Neely's opinions regarding any and all medical care costs in this case be excluded. His opinions regarding medical care costs are not based upon sufficient facts and data, within a reasonable degree of professional certainty, are

---

[15] See Exhibit D Neely Deposition Testimony 89:12-15
[16] See Exhibit J Dr. Neely Initial Expert Report

conclusory, lack an accepted methodology in the medical community, and ultimately do nothing more than mislead the finder of fact. The blatant bias Dr. Neely exhibited by strategically disregarding sufficient facts and data in this case render Dr. Neely's opinions unreliable.

### a. Dr. Neely's Opinions Regarding Medical Care Costs Are Not Within a Reasonable Degree of Professional Certainty.

FRE 702 requires all expert opinions to be within a reasonable degree of certainty. Dr. Neely's opinions regarding Plaintiff's medical care contain a significant analytical gap from the actual amounts owed by Plaintiff. In response to being asked what supported his medical billing opinions, Dr. Neely responded accordingly:

```
Q.    Are you holding yourself out as an
      expert in medical billing practices?
A.    No.
Q.    Okay.
A.    Not at all. We're on the receiving end
      of everything.
Q.    Sure. What's the -- so it looks like the
      billable cost for a procedure is about
      double what's actually collected by you?
A.    Somewhere between 50 percent and -- and
      100 percent billable.
Q.    What about cash?
A.    Well, that's negotiated whichever way
      you want it. If you've got someone who
      comes in here that's destitute and
      you're going to take them to the
      operating room, you know, you may want
      to do all this for $500 or less or for
      free. That's our prerogative on that.
Q.    Okay. But you might also expect and
      you'd be entitled to collect 100 percent
      of the -- the billed price; correct?
A.    You could set any price you want to if
      you're paying -- if you're, you know,
      collecting cash. Anything you want to
      agree with with a patient that the
      patient's agreeable to.
```

```
Q.    Would you agree with me that this - this
      range that you gave on page 12 doesn't
      take into account a cash payment?

A.    I would agree with that, yes.
```

Although Dr. Neely's opinions should be excluded for failing to even consider the cash value of medical treatment, his opinions regarding reasonable medical care costs fail to utilize methods which will support a conclusion within a reasonable degree of professional certainty, required by FRE 702.[17] Above, Dr. Neely testifies that the cash value is "whatever they agree to," versus a 50%-100% recovery with private insurance/Medicaid. to the same. Dr. Neely's testimony does not aid the fact finder, rather provides a misleading interpretation of medical billing practices.

Additionally, Dr. Neely's report and testimony opine that Mr. Diaz is a candidate to go back to commercial truck driving.[18] During Dr. Neely's deposition he admitted he does not know any of the qualifications of commercial truck driving and does not know the demands of operating a commercial vehicle. Dr. Neely's opinions in this subject matter lack foundation for him to make any assertions regarding commercial vehicle operation.

```
Q.    Okay. So when you are making that opinion
      that you believe Mr. Diaz is qualified to
      return to truck driving, you do not know
      what are the requirements by the federal
      government for a truck driver to be able to
      complete on the job?

A.    I do not.[19]
```

---

[17] Fed. R. Civ. E. 702
[18] See. Exhibit A Neely Rule 26 Expert Report.
[19] Exhibit K Neely Deposition Testimony 8:25-9:5

## II.    Dr. Neely's Report Fails to Meet the Requirements of Rule 26(a)(2)(B)

Federal Rule of Civil Procedure 26(a)(2) provides that "a party must disclose to other parties the identity of any witness it may use at trial to present evidence under the Federal Rules of Evidence 702, 703, or 705." Rule 26(a)(2)(B) requires that the report *must* contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and, (vi) a statement of the compensation to be paid for the study and testimony in the case."[20] The purpose is "to provide information on expert testimony sufficiently in advance of trial [so] that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."[21]

```
Q.    (BY MR. OGDEN) And -- and your report, both
      of them, are Rule 26 reports as we sit here
      today. And nowhere in that report does it
      contain any opinions about a disability
      finding. It doesn't contain any opinions
      about whether or not Mr. Diaz can deal with
      stress. It doesn't contain anything about Mr.
      Diaz seeming normal with his daughter during
      your examination in response to questions
      about his mental health. Isn't that true?
A.    True.
Q.    Okay. So all those reports -- all of those
      opinions, you would agree, for the first
      time today are being expressed?
A.    I've never been asked about those before. So
      those are all my personal opinions based on
      my 1 time spent with both of them.
```

---

[20] Fed. R. Civ. P. 26(a)(2)(B); *Guzman, supra.*

[21] *Id.*, quoting Fed. R. Civ. P. 26, Advisory Committee Note (1993 Amendments).

Q. Okay. And what accepted principles and
methods did you apply to your observations
to come to that conclusion to a reasonable
degree of professional certainty?
**A.   Just a lot of years of practicing**
**neurosurgery.**
Q. Right. I'm asking about what accepted
principles and methods you applied, because
that's what's required by the court.
**A.   Well, again, I -- I'm sorry. I don't know the**
**ends and outs of all the Rules 26 or the**
**rules 27 or anything like that.**
Q.   Sure.
**A.   So I'm pretty ignorant in that regard. So the**
**answer to my question is I'm just applying**
**my, again my education and my training and my**
**experience for over a lot of years of dealing**
**with patients. And I think that I'm pretty**
**good judge of the majority of these things.**
Q. Are you an expert in household services?
**A.   In what?**
Q. Household services.
**A.   No.[22]**

_____

When asked to opine on vocational testing provided to him by defense counsel, Dr. Neely
testified:

Q. Right. My question was geared towards the
testing. Why do you think you were getting
shown testing scores on vocational testing --
**A.   Well --**
Q. -- as a neurosurgeon?
**A.   -- I -- I don't know. I mean, he said – he**
**said -- he just showed it to me.**
Q. And said what?
**A.   I mean, he just said this is her – his**
**testing from whatever date -- whatever --**
**whatever date it was.**
Q. And you read it and said what?
**A.   I mean, I had never seen anything like that**
**before. And I asked him what does three mean**
**and what does six mean, that type of thing.**

_____

[22] See Exhibit L Neely Deposition Testimony 198:11-199:24

> **And he said he thinks that, like, it's the**
> **bottom of the bottom of the bottom, so to**
> **speak.**
>
> Q.  Okay. And why -- do you have opinion on that
>       one way or the other as a neurosurgeon?
> **A.  Well, I have an opinion having met Mr. Diaz**
> **and talking with him and examining him. And**
> **I would have been surprised to see him score**
> **that low.**
> Q.  Okay.
> **A.  Because I would have given him much, much,**
> **much higher marks on intelligence and --**
> **and, you know, just his thought processes and**
> **all that sort of thing.[23]**

Although admitting he had no idea what he was looking at and having never disclosed the

opinions in his Rule 26 reports, Dr. Neely still felt it necessary to opine on the scores given

and his opinions on Mr. Diaz's mental impressions. Dr. Neely's testimony is blatantly

unreliable in this instance. When asked about disability, Dr. Neely disagrees with the

treating physicians in this case on a disability finding, however then goes on to admit he

does not do any disability evaluations, and a disability doctor would be the person to that is

qualified to answer those questions.[24]

Nowhere in either of Dr. Neely's Rule 26 reports does he state that he has reviewed

a Medical Source Statement done by Dr. Qurashi[25]. This is in direct violation of Rule

26(a)(2)(B)(i-ii) which requires that the report *must* contain: (i) a complete statement of all

opinions the witness will express and the basis and reasons for them; (ii) the facts or data

considered by the witness in forming them; (iii) any exhibits that will be used to summarize

or support them; However, Dr. Neely attempts to testify in his deposition extensively on the

---

[23] See Exhibit M Neely Deposition Testimony 67:24-68:25
[24] See Exhibit N Neely Deposition Testimony 72:7-13
[25] See Exhibit O Medical Source Statement by Dr. Quaraishi

contents thereof, and his undisclosed opinions related to the findings. Dr. Neely opines to

the following:

> (1) Dr. Neely's knowledge of disability findings and how they relate to Plaintiff,
> (2) Plaintiff's ability to deal with the daily stresses of life,
>  (4) Plaintiff's ability to stay on task during daily activities,
> (5) Plaintiff's ability to interact with society,
> (6) Plaintiff's ability to work with others,
> (7) Plaintiff's difficulty maintaining social functions,
> (8) Plaintiffs ability to concentrate,
> (10) Plaintiff's ability to sit in an office chair for an 8-hour work day,
> (13) Plaintiffs ability to hold more than 10 lbs,
> (14) Plaintiffs necessity to lie down during a given work day,
> (15) Plaintiff's ability to function in a competitive work environment.[26]

When cross examined on these unqualified opinions, Dr. Neely testified as follows:

> Q.    I want to follow up with the last little bit --
>       we'll start with the last bit that you just
>       finished with Mr. Meurer for. You said that you
>       didn't have any problems with him going back to a
>       competitive business world because you didn't see
>       anything in the diagnostic findings when you saw
>       him for 45 minutes; is that true?
> **A.    Well, what I'm saying is I think that he was**
>       **functioning normally. In other words, he -- he --**
>       **competitive business, I mean, he -- I didn't see**
>       **any reason why he couldn't go back to being just**
>       **in a regular work capacity.**
> Q.    Are you an expert in that?
> **A.    No.[27]**
>
>       **...............**
>
> Q.    Based on your 45-minute examination of him, you
>       also said -- you came to an expert conclusion that
>       you don't -- you -- that Mr. Diaz can deal with
>       the daily stresses in life. Do you remember
>       testifying to that?
> **A.    I do.**
> Q.    Okay. Are you an expert in that?

---

[26] See Exhibit P Neely Deposition Testimony 162:01-172:25
[27] See Exhibit Q Neely Deposition Testimony 173:14-174:2

A.    **No.**[28]

..............…

Q.    Okay. And you are -- so are you holding yourself
      as an expert -- a medical expert that can testify
      as to whether or not a person can deal with the
      daily stresses of life?
A.    **I'm not a psychologist. I'm not a
      psychiatrist.**[29]

..............…

Q.    Okay. Let's talk about it. What'd you ask Mr. Diaz
      about his stresses in life?
A.    **I don't think I asked him about his stresses
      in life.**[30]

..............…

Q.    Did you do any sort of testing which would deal
      with weight over ten pounds?
A.    **No.**
Q.    So you're guessing at that?
A.    **Yes.**
Q.    Okay.
A.    **Based on reasonable medical probability.**
Q.    Okay. Based on a reasonable medical probability,
      you're guessing that the treating physician who
      evaluated him numerous times is wrong in his
      assessment of the weight Mr. Diaz can handle?
A.    **Yes.**[31]

..............…

Q.    Okay. You also mentioned in response to Mr.
      Meurer's questions that he should not be disabled.
      And I asked you about disabilities and you said I
      don't know anything about disabilities and I'm not
      the person to talk to. You remember that?
A.    **I'm not a disability examiner. That's what we were
      talking about.**

..............…

Q.    In -- in -- in the state of Texas to become
      disabled -- well, we'll start with the federal
      government. The steps for the federal government

---

[28] See Exhibit R Neely Deposition Testimony 177:13-19

[29] See Exhibit S Neely Deposition Testimony 177:23-178:3

[30] See Exhibit T Neely Deposition Testimony 178:15-18

[31] See Exhibit U Neely Deposition Testimony 194:3-14

has listed out for you to be classified as
disabled, are you willing to testify to those as
an expert in this case?

A.    **No.**[32]

............

Q.    You opine -- you disagreed with Dr. Quraishi that
Mr. Diaz has trouble staying on task with items.
What did you do --

A.    **I --**

Q.    -- in your evaluation that dealt with testing Mr.
Diaz' ability to stay on task?

A.    **Well, I mean, he was basically following my
commands or instructions or -- and had had -- you
know, conversing normally with me and -- and doing
what I wanted him to do. So I didn't see any --
any, you know, problems with his overall thought
processes that would keep him from, again,
functioning normally in society.**

Q.    Okay. So it's your testimony that you can spend 45
minutes with anyone in society, doing a
neurological evaluation of them, and be able to
determine whether or not they can have the ability
to stay on task with items? Is that what you're
testifying to this jury?

A.    **I'm not -- I'm not saying that I specifically
tested him for that. I think in my opinion I
didn't see any problems with his overall thought
processes that would prevent him from doing that,
no.**

Q.    Did you do any cognitive testing?

A.    **No.**

Q.    Did you do any testing whatsoever for any type of
what you just referred to as thought process?

A. **I did not, no.**[33]

............

Q.    And that -- and that's kind of what I'm
getting at --

A.    **Right.**

Q.    -- is you weren't even focused on it, yet you're
sitting here today giving opinions off the top
your head, because you didn't dictate any of them

---

[32] See Exhibit V Neely Deposition Testimony 194:15-196:8
[33] See Exhibit W Neely Deposition Testimony 202:12-203:15

```
              in your report, and that's the only notes we have;
              right?
      A.      I did not dictate anything that you're asking me
              about like that in my report because I wasn't
              asked to and I wouldn't be qualified for it
              anyway.³⁴
              ...............

      Q.      Which ones? See how this goes? Is -- I'm trying to
              understand what you remember from that day and
              what you don't, because it's not in your report.
              And, so, I feel like you're just going off memory.
              Is that fair to say?
      A.      The details of my report are the details that I
              was asked to actually evaluate Mr. Diaz for. And I
              think -- I -- I will certainly say I was not asked
              to evaluate anything that you're asking me about.
              True.³⁵
```

Dr. Neely has absolutely no qualifications or basis to be opining on any of the above-mentioned issues. Rule 26(a)(2)(B) requires that the report *must* contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them. None of this information was contained in Dr. Neely's Rule 26 reports, and he at no point supplemented his report to include any of this information. Dr. Neely's testimony should be stricken entirely with regards to the Medical Source Statement, if not entirely, based on Dr. Neely's willingness to testify to anything remotely prejudicial to Plaintiff. "When a party fails to comply with the requirements of Rule 26, the court may exclude the witness or report as evidence at trial, at a hearing, or on a motion, and may 'impose other appropriate sanctions.'"³⁶

## CONCLUSION

---

[34] See Exhibit X Neely Deposition Testimony 205:2-13
[35] See Exhibit Y Neely Deposition Testimony 206:16-25
[36] *Id.*, citing Fed. R. Civ. P. 37(c)(1).

All of Dr. Neely's opinions regarding the amounts of Plaintiff's outstanding medical care costs are not based on reliable methods, sufficient data, and cannot be determined to be within a reasonable degree of professional certainty. Accordingly, Plaintiff prays that this Court grant his Motion to Exclude all testimony related to commercial vehicle operation, the Medical Source Statement by Dr. Quaraishi, and all testimony related to medical billing.

Respectfully submitted,
FARRAR & BALL, LLP


*s/William R. Ogden*
WESLEY TODD BALL
State Bar No. 24038754
wes@fbtrial.com
KYLE W. FARRAR
State Bar No. 24034828
kyle@fbtrial.com
WILLIAM R. Ogden
State Bar No. 24073531
bill@fbtrial.com
1010 Lamar, Suite 1600
Houston, Texas 77002
Telephone:    713.221.8300
Telecopier:    713.221.8301

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing instrument has been served on counsel of  record in compliance with the Texas Rules of Civil Procedure on this 22nd day of June,  2018, by facsimile. US Postal Mail, hand-delivery, and/or e-mail.

*/s/ William R. Ogden*
WILLIAM R. OGDEN